UNITED STATES of America,
Plaintiff-Appellee,

v.

Enrique SANCHEZ and Juan Vela
Martinez, Defendants-Appellants.

No. 30754.

United States Court of Appeals,
Fifth Circuit.

Sept. 8, 1971.

Rehearing Denied Sept. 30, 1971.

James H. Wallenstein, Dallas, Tex.
Court-appointed for defendants-appellants.

Anthony J. P. Farris, U. S. Atty.,
James R. Gough, Raul A. Gonzalez, Theo
W. Pinson, III, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before COLEMAN, SIMPSON, and
RONEY, Circuit Judges.

COLEMAN, Circuit Judge:

This is an in forma pauperis appeal from a conviction of (1) conspiracy to smuggle marijuana into the United States in violation of 21 U.S.C. § 176a [1] and (2) smuggling marijuana into the United States in violation of the same statute. Five defendants were originally indicted under these counts and under an additional count of transporting and concealing marijuana without having paid a transfer tax in violation of 26 U.S.C., § 4744(a) (2). Two defendants, Victor Martinez Garza and Juan Martinez Villarreal, pleaded guilty to the violation of the tax count and were not tried on the other counts. The remaining three were tried on the conspiracy and smuggling counts. Roberto Longoria was acquitted. Enrique Sanchez and Juan Vela Martinez were convicted on both the conspiracy and smuggling counts. They were sentenced to six years concurrent on each count.

 Sanchez and Martinez appeal and raise the following specifications of error:

**1.**

The District Court erred in admitting into evidence the marijuana which was seized near Juan Vela Martinez's property about 11:00 p. m., March 9, 1970, and also erred in admitting into evidence the self-incriminating statement allegedly made by Martinez to the arresting officers shortly after the evidence had been seized.

We note that Sanchez had no standing to raise this issue, so the point applied only to Martinez.

**2.**

The District Court erred in not granting a mistrial following testimony by prosecution witnesses which was irrelevant and prejudicial.

This point applied to both appellants.

**3.**

The District Court erred in admitting into evidence a self-incriminating statement allegedly made by Martinez before he had received a *Miranda* warning.

 Only Martinez has standing to raise this issue.

We affirm the convictions of both appellants on both counts.

**I**

*The Facts*

The evidence is to be viewed in the light most favorable to the government, Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Williams v. United States, 5 Cir., 1968, 404 F.2d 493; Posey v. United States, 5 Cir., 1969, 416 F.2d 545.

On March 7, 1970, Juan Martinez Villarreal, Victor Martinez Garza, Enrique Sanchez, and Roberto Longoria left Corpus Christi, Texas, for Monterrey, Mexico. They travelled in two vehicles, a 1960 Ford Ranchero and a 1964 Ford station wagon. The purpose of the mission was to pick up a quantity of marijuana. After checking into a hotel in Monterrey, Sanchez and Longoria took the Ford Ranchero to an unknown location where they left it and returned to the hotel.

---

1. 21 U.S.C., § 176a

Notwithstanding any other provision of law, whoever, knowingly, with intent to defraud the United States, imports or brings into the United States marijuana contrary to law, or smuggles or clandestinely introduces into the United States marijuana which should have been invoiced, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such marijuana after being imported or brought in,

knowing the same to have been imported or brought into the United States contrary to law, or whoever conspires to do any of the foregoing act, shall be imprisoned not less than five or more than twenty years and in addition, may be fined not more than $20,000. For a second or subsequent offense, the offender shall be imprisoned for not less than ten or more than forty years and, in addition, may be fined not more than $20,000.

On March 9, 1970, the four men got into the station wagon and went to a parking lot at a shopping center. Sanchez and Longoria walked into an alley and returned thirty minutes later with the Ranchero. Villarreal and Garza got into the Ranchero and were instructed by Sanchez to take the Ranchero to Villarreal's apartment in Corpus Christi. Sanchez and Longoria returned to the United States in the station wagon.

Shortly before noon on March 9, 1970, Garza and Villarreal were stopped at Hidalgo, Texas, for the customary border inspection. Although they declared only two bottles of liquor and a guitar, suspicious customs officials searched the Ranchero and found beneath the rear floor deck a large plastic bag containing about sixty-four (64) pounds of marijuana. Garza and Villarreal first denied participating in a conspiracy to smuggle marijuana, but later confessed to the conspiracy and implicated Sanchez and Longoria. Armed with promises of cooperation from Garza and Villarreal, customs officials replaced the plastic bag, now containing forty-six (46) pounds of marijuana, beneath the rear floor deck of the Ranchero.

Two customs agents, Ramiro Villarreal and Bruce Van Matre, escorted Garza, Juan Martinez Villarreal, and the Ranchero to Juan Martinez Villarreal's apartment in Corpus Christi, arriving there about 7:00 o'clock, p. m. The agents accompanied Garza and Villarreal into the apartment and concealed themselves, Ramiro Villarreal behind a bed and Van Matre in a closet.

About 8:45 p. m. Juan Vela Martinez, one of the appellants, who had been on the trip to Mexico, entered Juan Martinez Villarreal's apartment and asked to be allowed to take the Ranchero and the marijuana to his residence. Juan Martinez Villarreal and Garza were, understandably, quite reluctant to agree to Martinez's request. In order to persuade them, Martinez said that some people from Houston were waiting for him, and that if it rained the load would get wet and ruin. He said that this must be their first trip and that if they had any questions about him they could call Sanchez, the other appellant who had also been to Mexico. He gave them Sanchez's telephone number. After much discussion Agent Villarreal signaled to Garza and the other Villarreal to release the Ranchero. They obeyed his order. Martinez, Juan Martinez Villarreal, and Garza left the apartment.

The customs agents had removed the rotor from the distributor of the Ranchero and it would not crank, therefore, Martinez and an individual who was later identified as his brother hooked the vehicle to their car, a 1964 Ford, and towed it to Martinez's home. Customs agents had followed the cars to Martinez's home and placed the Ranchero under surveillance. About 10:45 p. m. a 1968 Pontiac drove up to the Martinez home. Shortly thereafter, two agents saw someone taking a large box from the garage to the Pontiac. Fearing loss of the marijuana, the customs officials decided to enter the premises, arrest Martinez, and retake the marijuana. Several local police and customs officers entered Martinez's yard by the front gate and began to search the Ranchero, the garage, and the curtilage. Martinez was arrested. Three bags containing marijuana were found in a neighbor's yard, adjacent to the fence which surrounded Martinez's property. The officers had no warrant for arrest or search.

Upon hearing a remark by a city police officer that the bags looked like they contained about sixty-five (65) pounds of marijuana, Martinez volunteered, "If that's all there is then I got took. It looks like I got took". Sanchez was arrested on April 8, 1970.

The defendants claimed that their actions were consistent with an unsuccessful attempt to sell the Ranchero in Mexico, and Martinez denied having made any self-incriminating statements concerning the bags that were found near his home.

## II

### *The Discovery of the Marijuana on Neighboring Property*

■ Under the first specification of error, it is claimed that the marijuana seized near the home of Juan Vela Martinez was found as the result of an invalid search and, therefore, inadmissible in evidence. No motion was made in advance of the trial to suppress this evidence nor was any objection made at the time that the marijuana was offered in evidence, as required by Rule 41(e) of the Federal Rules of Criminal Procedure. In the absence of such a motion or objection the question of its admissibility will not be considered on appeal, Matthews v. United States, 5 Cir., 1969, 407 F.2d 1371; United States v. McCarthy, 9 Cir., 1970, 430 F.2d 1289:

> "For the search and admissibility of the product of the search to be challenged on appeal, that challenge must be made in the first instance in the trial court. 'Fairness to that court and to counsel and to the reviewing court demands this.' So do 'fair procedural requirements'. Carlton v. United States, 391 F.2d 684 (8th Cir. 1968); see also Darden v. United States, 405 F.2d 1054 (9th Cir. 1969)."

It is not to be forgotten, however, that the officers had already lawfully seized the marijuana at the border, had followed it to Corpus Christi while it was being transported in the Ranchero, and had followed the Ranchero to Martinez's house. Thus, it had been in their actual or constructive control all that time. Except for fleeting interruptions it had been under their direct observation for the same period. Moreover, the officers were lawfully on Martinez's property for the purpose of arresting him for the commission of a felony which, of their own knowledge, they knew to be in progress. Additionally, the marijuana was not on his property, but could be seen on adjacent property.

For reasons already stated, we do not find it necessary to decide the validity vel non of the search. We reiterate that the point could not have inured to the benefit of Sanchez, who had no right of possession to the curtilage of Martinez or the property next door.

## III

### *The Simmons Testimony*

■ Appellants claim that the District Court committed error in not granting a mistrial following testimony by the prosecution which they say was irrelevant and prejudicial.

This testimony occurred during the direct examination of Earl W. Simmons, a special agent of the United States Customs Bureau, by the United States Attorney.

During direct examination, Agent Simmons related that upon being advised that the recipients of the marijuana were to be Enrique Sanchez and Roberto Longoria, he went to check their residences. The following exchange then took place between the United States Attorney and Agent Simmons:

"Q. Well, how did you know where to go?

"A. I have known them for some time.

"Q. You have known who?

"A. Sanchez and Longoria.

"Q. You know them socially or you know them through the custom agency files?

"A. Through our service and through our files."

No objection was made to this testimony when it was first offered. The objection was made in the form of a motion for a mistrial which was not made until the following day. The Court was not asked to instruct the jury to disregard such testimony.

The contention is that the District Court erred in not granting the motion for a mistrial under Odom v. United States, 5 Cir., 1967, 377 F.2d 853. Odom was convicted by a jury verdict of receiving an automobile moving in interstate commerce which was known to be stolen.

This Court held that where the arresting officer was asked how long he had known the defendant and replied that he had seen the defendant "come in and out of jail and spoke with him for approximately a year and a half", the defendant was entitled to a mistrial. The mistrial was granted notwithstanding the fact that the following admonition was made by the trial court:

> "The statement about seeing him come in and out of jail is not responsive and it's stricken. Don't consider that in arriving at your verdict."

The impact of Odom has, however, been considerably tempered by Leonard v. United States, 5 Cir., 1967, 386 F.2d 423, and Russell v. United States, 5 Cir., 1970, 429 F.2d 237.

Leonard was convicted of the interstate transportation of an automobile, knowing it to have been stolen. We held that an unresponsive statement by a disinterested witness that the defendant had been arrested on June 8th was not so prejudicial as to require mistrial where the jury was immediately instructed to disregard any reference to the unrelated arrest. We noted the distinctions that could be drawn between *Odom* and *Leonard*; i. e., the fact that the *Odom* court felt the "jailhound" testimony could within itself have been responsible for convicting Odom since his defense seemed at least as strong as that of a co-defendant whom the jury had acquitted; the mention of an unrelated arrest had added nothing to the case against Leonard. We refused to compare the mention of arrest with the "jailhound" testimony in a case where criminal intent was the contested issue.

The holding in *Leonard* was followed in Russell v. United States, *supra*. During the course of the trial in the District Court, an F.B.I. agent testifying for the government, indicated on direct examination that he had received word that the defendant wanted to see him and at that time the defendant was confined in the Fulton County jail. De-

fendant's counsel moved for a mistrial alleging that the statement had prematurely injected the defendant's character into the trial and that the prejudicial effect of the statement could not be removed by a curative instruction to the jury. The court denied the motion. We held that the error did not harm the substantial rights of the defendant and was therefore harmless.

Although the statement under attack in the present case was made by an interested witness, was responsive to the question, and could have been anticipated by the prosecuting attorney, we do not think the words of Agent Simmons approached a prohibited status. As in *Leonard*, convincing evidence was given against the appellants. The mention of "files" added nothing to the case against them. The questioning by the United States Attorney continued with no further mention of the fact that Agent Simmons knew Sanchez and Longoria through custom agency files. The only other mention of files occurred when trial counsel for Martinez later asked another prosecution witness if any of the defendants were in the files kept by his department.

Moreover, the mere presence of the names in customs agency files did not necessarily mean that any arrest or conviction record existed against either Sanchez or Longoria. Even though the word "files" carries with it a possible connotation that records of some kind pertaining to them were being kept, it would have been as reasonable to suppose that they were government informers, or the like. Convictions, based on strong, if not absolutely conclusive evidence, are not to be overturned upon such surmise or conjecture as now sought to be engendered by this point.

## IV

### "I Got Took"

█ It is further asserted that the District Court erred in admitting into evidence testimony concerning a self-incriminating statement allegedly made by

Martinez before he received the *Miranda* warning.

The testimony of Captain Bonnie G. Freeman of the Corpus Christi Police Department who said he heard the self-incriminating statement is as follows:

\* \* \* \* \* \*

"Q. All right. Now I want to ask you were you questioning or interrogating him (Juan Vela Martinez) at this time?

"A. No Sir, I was not.

"Q. Were you having a conversation with him?

"A. No Sir. I was not.

"Q. All right, Sir. And you said you were having a conversation with Mr. Joseph?

"A. Yes Sir.

"Q. What did you say to Mr. Joseph?

"A. I remarked to Mr. Joseph it looks like about 65 pounds of marijuana.

"Q. Referring to what?

"A. I was referring to the three bags of marijuana that had been seized.

"Q. All right, Sir. And did anyone say anything after that?

"A. Yes Sir.

"Q. What?

"A. Mr. Juan Vela Martinez said, if that's all there is then I got took. It looks like I got took."

\* \* \* \* \* \*

Counsel for Martinez immediately objected to the admission of this testimony into evidence. His objection, however, was overruled.

The government concedes that Martinez had been placed under arrest and had not been given the *Miranda* warning at the time that he allegedly made the statement. But it correctly contends that the statement allegedly made by Martinez is not within *Miranda* since it was volunteered and did not result from interrogation, custodial, or otherwise.

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination guaranteed all citizens of the United States by the Fifth Amendment, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Custodial interrogation within the rule limiting the admissibility of statements stemming from such interrogation, means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way, Miranda v. Arizona, *supra*; Posey v. United States, *supra*; United States v. Montos, 5 Cir., 1970, 421 F.2d 215.

Voluntary statements of any kind, not in response to custodial interrogation, are not barred by the Fifth Amendment, nor has their admissibility been affected by the *Miranda* decision or its progeny.

In several cases voluntary self-incriminating statements made by persons under arrest have been ruled admissible, notwithstanding the fact that *Miranda* warnings had not been given at the time the statements were made. See United States v. Welsh, 5 Cir., 1969, 417 F.2d 361; United States v. Bourassa, 10 Cir., 1969, 411 F.2d 69, cert. denied 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969); United States v. Godfrey, 10 Cir., 1969, 409 F.2d 1338; Anderson v. United States, 10 Cir., 1968, 399 F.2d 753.

The judgment of the District Court is Affirmed.